UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

CRISIS PREGNANCY SERVICES, INC.,
doing business as COMPASSCARE,

          Plaintiff,

   v.

JENNIFER L. PAGE et al.,

          Defendants.

───────────────────────────────

HANNAH KAMKE,

          Counterclaim Plaintiff,

   v.

CRISIS PREGNANCY SERVICES, INC.,
doing business as COMPASSCARE,

          Counterclaim Defendant.

───────────────────────────────

23-CV-1057-LJV
DECISION & ORDER

On October 5, 2023, the plaintiff, Crisis Pregnancy Services, Inc.—which does business under the name "CompassCare" and "operates a reproductive health facility in Amherst, New York"—filed this action under the Freedom of Access to Clinic Entrances Act (the "FACE Act").  Docket Item 1 (complaint); Docket Item 23 (amended complaint). It alleges that the defendants—Hannah Kamke, Jennifer L. Page, "John Doe," and "Jane Doe"—violated the FACE Act by threatening and intimidating those who sought to access CompassCare's Amherst facility; by obstructing access to the facility; and by damaging CompassCare's property.  *See* Docket Item 23 at ¶¶ 51-78.

After Page moved to dismiss the amended complaint for failure to state a claim, Docket Item 29, CompassCare responded, Docket Item 36, and Page replied, Docket Item 41.  In the meantime, Kamke answered the amended complaint and raised three counterclaims against CompassCare.  Docket Item 33.  CompassCare then moved to dismiss the counterclaims for lack of subject matter jurisdiction and failure to state a claim, Docket Item 37, and Kamke cross-moved to amend her counterclaims, Docket Item 46.

After all the pending motions were briefed, *see* Docket Items 51 and 52, this Court heard oral argument, *see* Docket Item 57.  It reserved decision on Page's motion to dismiss, but it granted Kamke's motion to amend her counterclaims and denied without prejudice CompassCare's motion to dismiss the counterclaims.[1]  *See* Docket Items 57 and 58.

Following oral argument, Kamke filed a second amended answer, including an amended second set of counterclaims, Docket Item 59, and CompassCare again moved to dismiss the counterclaims for lack of subject matter jurisdiction and failure to state a claim, Docket Item 60.  Kamke responded, Docket Item 66, and CompassCare replied, Docket Item 69.

For the reasons that follow, this Court grants in part and denies in part Page's motion to dismiss, Docket Item 29, and also grants in part and denies in part CompassCare's motion to dismiss Kamke's counterclaims, Docket Item 60.

---

[1] The Court also denied Kamke's motion for a Federal Rule of Civil Procedure 16 conference pending its decision on Page's motion to dismiss and CompassCare's potential renewed motion to dismiss Kamke's counterclaims.  *See* Docket Items 57 and 58.

## BACKGROUND[2]

### I.   COMPASSCARE'S AMENDED COMPLAINT

The parties in this action come from two sides of the abortion debate, an issue that has divided our nation for decades.  Indeed, CompassCare says that its lawsuit is best understood against the backdrop of a "climate of fear" incited by a campaign "of violence against pro-life pregnancy centers and health care facilities" spearheaded by "militant pro-abortion advocates over the past several years."  Docket Item 23 at ¶ 1; *see also id.* at 23-72[3] (media coverage of these events attached as exhibit).  According to CompassCare, this violent wave was exacerbated by the leak of the Supreme Court's draft opinion in *Dobbs v. Jackson Women's Health Organization* and the subsequent decision overturning *Roe v. Wade.  See id.* at ¶¶ 1-5; *see also Dobbs*, 597 U.S. 215 (2022); *Roe v. Wade*, 410 U.S. 113 (1973).  CompassCare cites in particular the actions of "Jane's Revenge," which it describes as a "left-wing, pro-abortion, extremist group"

---

[2] The following facts are taken from the amended complaint, Docket Item 23, and the second amended counterclaims, Docket Item 59.  With respect to Page's motion to dismiss, this Court also takes judicial notice of documents she submitted with that motion:  (1) "[two] excerpt[s] from the Congressional Record"; (2) "[a] record from the City of Buffalo's public calendar"; and (3) "[a] screenshot of an internet mapping service showing the distance and travel time" between two locations.  *See* Docket Item 54 (granting Page's unopposed motion to take judicial notice of these documents); Docket Items 32-1, 32-2, 32-3, and 32-4 (copies of those documents).

When considering Page's motion to dismiss, the Court "accept[s CompassCare's] factual allegations as true and draw[s] all reasonable inferences in favor of [CompassCare]."  *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  When considering CompassCare's motion to dismiss Kamke's counterclaims, this Court "accept[s Kamke]'s factual allegations as true" and draws all inferences in her favor.  *See Naor World Media Films, Inc. v. JC Prod.*, 2024 WL 1177977, at *1 & n.1 (S.D.N.Y. Mar. 19, 2024).

[3] Page numbers in docket citations refer to ECF pagination.

that has "carried out multiple attacks on pro-life organizations, churches, and [even] a Congressional office."  Docket Item 23 at ¶¶ 4-5; *see also id.* at 73-88 (blog entries from Jane's Revenge's website attached as exhibit).

CompassCare—"a New York not-for-profit corporation" that "operates a reproductive health facility in Amherst, New York"—is firmly on the "pro-life" side of the debate.  *Id.* at ¶ 31.  It "has been Upstate New York's leader in providing women with pro-life reproductive health services," which it provides "at no cost."  *Id.*  Defendants Page and Kamke, on the other hand, are on the other side.  Indeed, according to CompassCare, Page "is a self-described 'abortion enthusiast' and 'Antifa wannabe'" who "has obsessively devoted herself to radical pro-abortion activism against pro-life pregnancy centers in general and CompassCare in particular."  *Id.* at ¶¶ 32-33.  And Kamke, CompassCare says, also is a "pro-abortion extremist and activist who . . . posed as a potential client of CompassCare in a politically[ ]motivated effort to 'expose' non-existent fraud and deception in CompassCare's pro bono services to expectant mothers."  *Id.* at ¶ 36.

In May 2021, CompassCare hosted its annual "Walk for Life," an "annual family-friendly event . . . to raise awareness of the value of all human life" and to "rais[e] funds to provide for the unmet healthcare . . . needs of women considering abortion."  *Id.* at ¶ 37.  Page "organized a counter[-]protest" in which "pro-abortion extremists banded together in disguise to block the public highway" and impede Walk for Life attendees "from exercising their First Amendment rights."  *Id.* at ¶ 38.  The counter-protesters "plac[ed] vertical spikes in the road," seeking "to injure pro-life marchers."  *Id.* at ¶ 39. And several individuals whom CompassCare calls "Page's co-conspirators" engaged in

acts of violence, including "hit[ting] a police officer with a bullhorn, punch[ing] a CompassCare supporter, plac[ing] nails and glass in a public walkway[,] and [writing] lewd, vulgar, [and] threatening messages on the sidewalk."  *Id.*

CompassCare says that "[t]hese actions were intended by Page to induce fear of violence, including bodily harm[,] in the context of the . . . ongoing nationwide campaign of violence by Jane's Revenge."  *Id.* (internal quotation marks omitted).  In fact, CompassCare says, Page's counter-protest "threaten[ed] and intimidate[d] patients, employees, prospective patients[,] and supporters of CompassCare from working at, seeking services from, or supporting CompassCare."  *Id.* at ¶ 38.

Page did not stop protesting after the May 2021 events.  On the contrary, she twice organized demonstrations at [CompassCare's] Amherst [f]acility."  *Id.* at ¶ 40.

First, sometime in early June 2022,[4] Page "trespass[ed] on the [facility's] property and wr[ote] graffiti in [its] driveway . . . , thereby blocking the entrance to the facility's parking lot."  *Id.*  More specifically, Page wrote "'Lying to women is a sin' . . . on the private portion of CompassCare's driveway."  *Id.*  CompassCare says that Page's conduct was "intend[ed] to deter[] and in fact deter[red] staff, volunteers, and patients from entering the facility."  *Id.*  Then, sometime after that, "Page trespassed at the Amherst [f]acility and stole a no[ ]trespassing sign," an act for which "[s]he was eventually arrested [by the Amherst Police] and charged . . . with theft."[5]  *Id.* at ¶ 41. CompassCare says that "both occasions were brazen intimidation" designed to "send

---

[4] CompassCare does not specify when this incident occurred except to say that it was just "days" before the firebombing incident on June 7, 2022, discussed below.  *See* Docket Item 23 at ¶ 40.  The Court therefore assumes that it was in early June.

[5] Again, CompassCare does not say when exactly this theft occurred.

the message" to CompassCare and those seeking to access it that they were "not safe from [Page] or from Jane's Revenge." *Id.* at ¶ 42 (internal quotation marks omitted).

On June 7, 2022, "two masked individuals"—defendants Jane and John Doe (the "Doe defendants")—"firebombed CompassCare's Amherst . . . facility by throwing Molotov cocktails through a window." *Id.* at ¶ 9. The Doe defendants also "spray-paint[ed] graffiti on the building saying 'Jane was Here'"—the "calling card" of Jane's Revenge, "often le[ft] . . . at the site of [an] attack."[6] *Id.* at ¶¶ 6, 11. "The firebombing drew a large response from firefighters and law enforcement," and "[a]t least two firefighters were injured in the blaze." *Id.* at ¶ 10. It caused more than $500,000 in damage and "forced [CompassCare to] clos[e] . . . the [Amherst] facility and . . . diver[t] . . . clients to other CompassCare locations for 52 days" while repairs were made. *Id.*

CompassCare says that Page "was likely in contact" with the Doe defendants regarding the firebombing of CompassCare. *Id.* at ¶ 44. In fact, CompassCare says, Page "immediately . . . arrived at the scene to videotape the damage" for celebratory Instagram posts following the attack and, "in exchange for leniency" in her criminal case, "provided law enforcement with information" about the Doe defendants. *Id.* at ¶¶ 43-44. Moreover, Page has long "follow[ed] Jane's Revenge on social media" and prior to the June 7 attack, "favorably acknowledged and ['liked'] reports of a Jane's Revenge attack on a crisis pregnancy center in Maryland." *Id.* at ¶ 34 (internal quotation marks omitted).

---

[6] CompassCare includes photographs of the damage, including the graffiti, in its amended complaint. *See* Docket Item 23 at ¶¶ 9, 11.

In addition, Page "has twice made reference to arson against crisis pregnancy centers on social media." *Id.* at ¶ 35. In the first instance, she referred "to 'two Molotov cocktails' as a Christmas gift in a parody of the song 'The Twelve Days of Christmas.'" *Id.* In the second, which followed the "leak[] of the [draft] *Dobbs* decision" and was "thus only days before the bombing" of the Amherst facility, she wrote, "Get the matches because I am the f---ing gasoline." *Id.*

CompassCare does not allege that Kamke was involved in or linked to the June 2022 firebombing. But it says that like Page, Kamke is vehemently "pro-abortion" and made CompassCare the focal point of her ire. More specifically, it says that on March 16, 2023, at approximately 12:30 a.m., Kamke "trespassed [on] the Amherst facility['s] property . . . and spray-painted" the word "Liars" over CompassCare's business sign. *Id.* at ¶ 45. Kamke was "arrested[ and] charged" in connection with this incident, eventually pleading guilty to disorderly conduct in Amherst Town Court. *Id.*

CompassCare says that Kamke's spray-paint message "tellingly echoed Page's earlier threatening message . . . that 'Lying to women is a sin'" and caused over $2,500 in damages. *Id.* It alleges that both women followed each other on Instagram at the time of the March 16 trespassing and that both "have significant Instagram followings." *Id*. at ¶ 47. This suggests, CompassCare asserts, that they both are "connected to each other" as well as to "many others regarding pro-abortion extremist activity." *Id.* And CompassCare says that "[b]ased on [these] facts," it "believes that both Page and Kamke belong to a 'cell' of local pro-abortion extremists who consider it their mission to intimidate, interfere with, and obstruct the operation of pro-life pregnancy centers," particularly CompassCare. *See id*. at ¶ 48.

Based on the above chain of events, CompassCare asserts four claims and a request for injunctive relief under the FACE Act. *See* Docket Item 23 at ¶¶ 51-85. More specifically, it asserts claims (1) against all defendants for "[t]hreatening and [i]ntimidating [p]ersons in [v]iolation of 18 U.S.C. §[ ]248(a)(1)"; (2) against Page and the Doe defendants for "[e]ngaging in [p]hysical [o]bstruction in [v]iolation of 18 U.S.C. §[ ]248(a)(1)"; (3) against the Doe defendants for "[e]ngaging in force in violation of 18 U.S.C. §[ ]248(a)(1)"; and (4) against all defendants for "[d]amaging the [p]roperty of a [r]eproductive [h]ealth [s]ervices [f]acility in [v]iolation of 18 U.S.C. §[ ]248(a)(3)." Docket Item 23 at ¶¶ 51-78 (bold omitted). And it seeks a permanent injunction against all defendants under 18 U.S.C. § 248(c). *Id.* at ¶¶ 79-85.

## II.    KAMKE'S COUNTERCLAIMS

Kamke tells a different story. "She is not a pro-abortion activist," she says; rather, she is simply someone who sought "unbiased reproductive health services" from CompassCare and did not get them. *See* Docket Item 59 at 22-23.[7] In contrast to CompassCare's focus on extremist violence against crisis pregnancy centers and other pro-life, anti-abortion groups, Kamke offers a different context for the dispute: the proliferation of crisis pregnancy centers, which Kamke says "outnumber abortion clinics 3-to-1" in the United States. *See id.* at 24. According to Kamke, such facilities—which "often [are] faith-based"—"get pregnant people in the door by using a number of

---

[7] Because the second amended counterclaims restart the numbering of paragraphs several times, the Court refers to page numbers rather than paragraph numbers when citing them.

underhanded tactics, including by misrepresenting the services they provide and obfuscating their purpose and whether they offer abortions." *Id.*

According to Kamke, CompassCare is one example of this trend. *See id.* at 23-27. She says that CompassCare has its origins in a "Bible study group" and that the organization "has stated in prior litigation that its 'Christian faith and religious beliefs motivate and permeate its mission and all of its activities.'" *Id.* at 27. And she asserts that while the organization "trumpets itself as a leader in a broader anti-abortion network," it "purposefully does not . . . make [its] religious allegiances apparent on its consumer-facing website"—part of "a deliberate effort to confuse pregnant people" seeking reproductive healthcare, including abortion. *See id.* at 26, 28.

Kamke alleges that she was one such person ensnared by CompassCare's false advertising. In late November 2021, Kamke "suspected that she might be pregnant [because] her menstrual cycle was several weeks late." *Id.* at 33. After the results of "multiple over-the-counter pregnancy tests . . . returned a positive result," Kamke believed that she was "probably pregnant." *Id.* She went online to seek reproductive healthcare, wishing "to confirm the pregnancy with a properly administered ultrasound overseen by a medical doctor and, if she was actually pregnant, obtain an abortion." *Id.* "Due to her financial circumstances," she specifically was looking for "free reproductive health services." *Id.*

Sometime around November 27, 2021, "Kamke conducted a [Google] search . . . for abortion services in Buffalo." *Id.* "She first reached out to Buffalo Women Services, a well-respected abortion care provider in the region," but when "they were not able to timely fit her in for an appointment," she "reached out to CompassCare, another . . . top

result[] from [her Google] search." *Id.*  Kamke says that CompassCare was "list[ed] as an abortion clinic" and that its website "nowhere expressly stated that it did not provide abortion and instead touted the 'unbiased'"—and free—"medical services it provides." *See id.*  "[A]t every turn," she asserts, CompassCare falsely presented itself "as a legitimate secular reproductive healthcare facility." *Id.* at 33-35.

Relying on that representation, Kamke scheduled an appointment at CompassCare's Amherst facility. *Id.* at 34.  On the phone call with a CompassCare employee to set up the appointment, Kamke "directly asked . . . if CompassCare provided abortions" and clearly stated that she wanted an abortion "if she was in fact pregnant." *Id.*  "But the employee misled . . . Kamke" by "fail[ing] to specify what services" the organization provided and failing to "clearly answer" her question. *See id.* Kamke says that these "misrepresentations and obfuscations" were successful in getting her to CompassCare's facility, which was "the intended outcome of CompassCare's deceptive conduct." *Id.*

On December 1, 2021, Kamke went to her appointment at CompassCare's Amherst facility. *Id.* at 35.  "At this point, she suspected she was about [six] weeks pregnant." *Id.*  "Upon [her] arrival, a CompassCare employee asked her to sign several releases," which finally made Kamke "realize that CompassCare was a religious organization" that "did not provide abortion services."[8] *Id.*  Kamke then "knew that she could not receive the complete healthcare she might require" at CompassCare. *Id.*

---

[8] Kamke says that even then, the releases did not convey this information "forthrightly."  Docket Item 23 at 35.  "Instead," the fact that CompassCare does not offer abortions was included "at the very bottom of one of [the] releases." *Id.*

But Kamke still "did not leave because she needed a free pregnancy test and ultrasound and believed CompassCare would at least provide these services at an appropriate standard of care." *Id.* After all, the release she was given stated that "CompassCare had a duty to provide her with 'a non-biased presentation of *all* her pregnancy-related options' and 'objective information about *all* of her legal options related to pregnancy and pregnancy termination.'" *Id.* (bold omitted) (quoting Docket Item 59-12 at 13). And another release informed her that "a medical doctor would be conducting and/or reviewing any ultrasound performed [on her]." *Id.* at 36.

Kamke says that her assumption that CompassCare would provide her unbiased medical care was mistaken. In fact, she says, its policy "requires all its employees to agree to never refer or advise any woman to have an abortion." *Id.* at 35 (citation and internal quotation marks omitted). And her own experience was anything but unbiased. Kamke says that after she "signed the releases," she was "directed . . . to a bathroom [to take] a hCG pregnancy test"—"which is the same as an at-home pregnancy test." *Id.* at 36. Afterwards, she was taken to an examination room, where she met "Janet Chapman, a registered nurse employed at CompassCare's Amherst [f]acility." *Id.* In response to a question from Kamke, Chapman made a comment suggesting that "individuals who obtained abortions were more likely to be sexually promiscuous and, therefore, more likely to get [sexually transmitted diseases]," which made "Kamke feel stigmatized and shamed." *Id.*

Kamke's experience did not improve as the visit continued. Chapman "proselytized [her] for approximately [20] minutes," making Kamke increasingly uncomfortable, and then "informed [her] that her pregnancy test was negative." *Id.* at

36-37.  Chapman nevertheless "suggested that . . . Kamke also receive a transvaginal ultrasound to confirm the pregnancy test's results," did not "obtain . . . Kamke's informed consent," but performed the ultrasound anyway and even though Chapman is not a doctor.  *See id.* at 37-38.

After Chapman confirmed and told Kamke that she was not pregnant, "another CompassCare employee," who Kamke believes was another nurse at the facility, told Kamke "that a 'miracle' of God had turned [the] negative pregnancy test positive" and that Kamke was, in fact, pregnant.  *See id.* at 39.  Kamke believes that the nurse improperly—and against medical practice—"read the result[] of the pregnancy test a second time, long after the appropriate window to review the test," thus causing a "false positive."  *Id.*  Chapman "did not correct or refute [the other nurse's] pronouncement."  *Id.*

Kamke left CompassCare "feeling demoralized," "violated," and "confused about [whether] she was pregnant."  *Id.*  She "lived with this agonizing unclarity for weeks and conducted worried Google searches for images of ultrasounds showing pregnancies to compare to her own ultrasound," until she finally determined that she was not pregnant. *Id.* at 39-40.  "[T]o this day," she "feels humiliated" by what she describes as "CompassCare's deception": "lur[ing]" her to the Amherst facility "under the false pretense of free abortion care," an experience that "inflicted unnecessary trauma upon [her]" in a moment when she already was "facing the challenges of a possible unplanned pregnancy."  *Id.* at 40.  And she says that the experience has left a lasting impact upon her, including "a deep distrust of healthcare providers" and "tumult" in her personal and professional life.  *See id.*

On March 15, 2023—a little more than a year after her visit and still feeling "ang[ry], frustrat[ed], and . . . trauma[tized]"—Kamke "spray[-]painted 'LIARS' on a sign outside . . . CompassCare's Amherst [f]acility." *Id.* at 41.  She says that she "acted alone and did *not* act out of a broader political motive or movement or to make a statement about abortion writ large." *Id.*  "Rather, her actions were based solely on her own personal experience as a client seeking care at CompassCare," where she believes she was lied to about "the nature of the organization," the "services it provided," and whether she was even pregnant. *See id.*

Kamke was charged for spray-painting the sign, and on March 25, 2023, she spoke to Page for "[t]he first time . . . ever," asking "about getting legal help." *Id.* at 42. Ultimately, Kamke pleaded guilty in Amherst Town Court "to a single charge of disorderly conduct" in violation of New York Penal Law § 240.20(7).  Docket Item 59 at 42.  "Pursuant to her plea, . . . Kamke paid full restitution of $2,580 to CompassCare for any and all property damage caused by her actions" and she "consented to an oral admonition by Amherst Town Court to stay away from CompassCare's Amherst [f]acility." *Id.*

Kamke says that she "had no prior knowledge, involvement, or relationship with the perpetrators [of the June 7 firebombing] whatsoever" and that she is not "part of any so-called extremist cell of pro-abortion activists." *Id.*  On the contrary, she says, "[s]he is just a woman who believed she might be pregnant [and] sought accurate medical care and counseling at CompassCare"—care and counseling that, in breach of CompassCare's duty to her as a patient, she says she did not receive. *See id.*

13

Kamke asserts three counterclaims against CompassCare under New York State law: (1) medical malpractice; (2) negligence; and (3) negligent infliction of emotional distress. *See id.* at 43-49.

## LEGAL PRINCIPLES

Under Federal Rule of Civil Procedure 12(b), a case may be dismissed, among other reasons, for "lack of subject[ ]matter jurisdiction" or for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(1), (6).  Rule 12(b) "applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  *Xerox Corp. v. Lantronix, Inc.*, 342 F. Supp. 3d 362, 367 (W.D.N.Y. 2018) (quoting *Gerdau Ameristeel US Inc. v. Ameron Int'l Corp.*, 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014)).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)); *see Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) ("'[F]ederal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978))). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova*, 201 F.3d at 113.

A case may be dismissed for failure to state a claim under Rule 12(b)(6) if it does not include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

## I.    PAGE'S MOTION TO DISMISS

As noted above, CompassCare asserts claims against Page under the FACE Act for: (1) threats of force, (2) physical obstruction, and (3) property damage.[9]  *See* Docket Item 23 at ¶¶ 51-59, 67-78.  Page argues that all FACE Act claims against her must be dismissed for at least two reasons.  *See* Docket Items 29 and 30.  First, she says that CompassCare does not allege that she engaged in any of the conduct—that is, threat of force, physical obstruction, or intentional damage—prohibited by the statute.  Docket Item 30 at 15-23, 27-28.  Second, she says that CompassCare does not allege that she "acted because the targeted person was or is obtaining or providing reproductive health services."  *See id.* at 25-26.  And for the claims under section 248(a)(1)—threat of force

---

[9] In addition, CompassCare's fifth "cause of action" raises a claim for injunctive relief.  *See* Docket Item 23 at ¶¶ 79-85.  Page argues that CompassCare "incorrectly styles" its "request[ for] injunctive relief" as "a cause of action" and that its request for injunctive relief should be denied for that reason alone.  Docket Item 30 at 14, 31.  CompassCare calls this "an anachronistic appeal to 19[th] century pleading practice" and says that "dismissal is obviously unwarranted."  Docket Item 36 at 29-30.  This Court agrees with CompassCare that its request for injunctive relief should not be dismissed simply because it is styled as a separate cause of action.

and physical obstruction—Page says that CompassCare does not allege that she "intentionally[ injure[d], intimidate[d], or interfere[d] with someone[ who was attempting to access a clinic], or attempt[ed] to do the same," as required by the FACE Act.  *See id.* at 23-25.

###    A.    The FACE Act

The origins of the FACE Act can be found in the Supreme Court's 1993 decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).  There, the Court held that a person "injured by the obstruction of access to abortion-related services" could not seek relief under 42 U.S.C. § 1985(3).[10]  *See Zhang Jingrong v. Chinese Anti-Cult World All.*, 314 F. Supp. 3d 420, 429 (E.D.N.Y. 2018) (citation omitted).  The following year, Congress passed the FACE Act, which created a private right of action against those who impede access to "reproductive health services" in one of two ways.  *See* 18 U.S.C. § 248(c)(1).

More specifically, subsection (a)(1) makes it unlawful to

by force or threat of force or by physical obstruction, intentionally injure[], intimidate[] or interfere[] with or attempt[] to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

*Id.* § 248(a)(1).  And subsection (a)(3) of the act makes it unlawful to "intentionally damage[] or destroy[] the property of a facility, or attempt[] to do so, because such facility provides reproductive health services."  *Id.* § 248(a)(3).  Any person who violates

---

[10] Section 1985(3) provides a private right of action against defendants who, among other things, "conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws; or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).

the statute may be subject to criminal penalties, *see id.* § 248(b), or to civil remedies, "including temporary, preliminary[,] or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses," *id.* § 248(c)(1)(B).

### B.    Section 248(a)(1) Claims

To state a claim under section 248(a)(1), a plaintiff must allege that a defendant used one of three means: (1) "force"; (2) "threat of force"; or (3) "physical obstruction." *See* 18 U.S.C. § 248(a)(1); *Allentown Women's Ctr., Inc. v. Sulpizio*, 403 F. Supp. 3d 461, 467 (E.D. Pa. 2019) ("Although certain actions may intimidate, these actions only violate FACE if they also constitute a use of force, a threat of force, or physical obstruction.").  The complaint alleges that Page engaged in two of the three here:  The first cause of action alleges that Page threatened force against those connected with CompassCare, and the third cause of action alleges that Page physically obstructed access to CompassCare.[11]  *See* Docket Item 23 at ¶¶ 51-59, 67-71.  The Court examines each of those claims in turn.

---

[11] The amended complaint does not allege that Page used force.  *See* Docket Item 23; *see also* Docket Item 36 at 10 (observing that the amended complaint does not "allege that Page engaged in force in violation of [the] FACE [Act]").  CompassCare appears to suggest that it may amend its complaint in the future to add such a claim, stating that "discovery may later reveal an actionable connection between Page" and the Doe defendants who "firebombe[d] CompassCare's Amherst facility.  *See* Docket Item 36 at 9.  But because the amended complaint does not assert any such claims, the Court does not consider them here.

### 1.    Threat of Force

CompassCare says that Page "threatened" people seeking to access its Amherst

facility in violation of section 248(a)(1) of the FACE Act through her "deliberate acts of

trespass, damage, theft[,] and vandalism."[12]  Docket Item 23 at ¶ 56.  More specifically,

CompassCare says that Page

> organized demonstrations at the Amherst [f]acility, trespassing on the
> property and writing graffiti in the driveway of the facility, thereby blocking
> the entrance to the facility's parking lot and intending to deter, and in fact
> deterring, staff, volunteers, and patients from entering the facility.  The
> graffiti included the statement "Lying to women is a sin," written on the
> private portion of CompassCare's driveway next to the very windows
> through which, days later, Molotov cocktails were thrown by "Jane's
> Revenge" activists during the June 7, 2022, bombing.  Page celebrated the
> bombing on social media, while claiming "it wasn't me" and that she had an
> alibi.

*Id.* at ¶ 40.  And CompassCare says that"[o]n . . . another occasion, Page trespassed at

the Amherst [f]acility and stole a no[ ]trespassing sign.  She was eventually arrested and

charged by Amherst Police with theft."  *Id.* at ¶ 41.  According to CompassCare, "Page's

actions on both occasions were brazen intimidation in violation of FACE intended to

send the message 'You are not safe' from [Page] or from . . . [the] radical pro-abortion

extremists [with whom Page is associated]."  *Id.* at ¶ 42.

The Second Circuit has noted that courts must be "mindful . . . of the fact that an

erroneous application of [the FACE Act] threatens to impinge legitimate First

---

[12] In its response to Page's motion to dismiss, CompassCare clarifies that many
of the facts alleged in the amended complaint are "merely historical and contextual
facts[] alleged to show" Page's intent as well as to provide context for the "threat
analysis."  *See* Docket 36 at 8-10.  In other words, CompassCare says that its
allegations related to Page's activities in organizing a counter-protest to the "Walk for
Life" event as well as her social media activity are alleged not to say that those activities
in and of themselves violated the FACE Act but to provide the necessary facts to show
why her actions at the Amherst facility violated that statute.  *See id.*

Amendment activity." *See New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2001).  Indeed, in *Operation Rescue*, the court vacated in part the district court's order under the FACE Act enjoining two anti-abortion, pro-life protesters from protesting outside abortion clinics.  *Id.* at 196.  The court expressed concern regarding "the [d]istrict [c]ourt's willingness to characterize a broad range of protester statements as 'threats' without giving them the full analysis required by the First Amendment."  *Id.*

As the Second Circuit has explained, to determine "whether conduct amounts to a true threat," courts must apply an objective test, asking "whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury."  *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (quoting *United States v. Davila,* 461 F.3d 298, 305 (2d Cir. 2006)); *see also Virginia v. Black*, 538 U.S. 343, 360-61 (2003) (explaining that "true threats" are not protected by the First Amendment and "encompass . . . statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," regardless of whether "[t]he speaker . . . actually intend[s] to carry out the threat").

Page argues that the conduct CompassCare alleges to be a threat falls far short of that bar.  Docket Item 30 at 17-21.  For the reasons that follow, this Court agrees.

As an initial matter, while Page's theft of a "no[ ]trespassing" sign may constitute "damage[]" under section 248(a)(3)—a question that this Court addresses below, *see infra* Section I.C—it is difficult to understand how a reasonable person would interpret that act as threatening the use of force.  Page's written statement that "Lying to women

is a sin" is more openly critical of CompassCare and perhaps even somewhat sinister. Still, it is a stretch to call it a threat.

As Page observes, *see* Docket Item 30 at 19, in *Operation Rescue*, the Second Circuit held that a protester's statement to a doctor that "killing babies is no different than killing doctors" was not a "true threat" and thus, not a "threat" under the FACE Act. *See* 273 F.3d at 196-97. As the court explained, the protester's "expression went to the core of her protest message, and the statement (even in context) did not suggest that [she] was engaged in a plan to harm the clinic doctor." *Id.* In other words, "[t]h[e] statement did not indicate the 'unequivocal immediacy and express intention' of a true threat." *Id.* at 197 (quoting *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976)). Thus, "[i]t was not a direct or even veiled threat, but expression of a political opinion," and "[a]s such, it [wa]s entitled to First Amendment protection." *Id.*

Page says that what was true of that statement in *Operation Rescue* is true of her statements here: Both were political opinions, not intimations of force; they did not express a "serious intent to engage in any act of violence against someone" nor did they have the "unequivocal immediacy and express intention" of a true threat. *See* Docket Item 30 at 17-21.

CompassCare counters that both Page and *Operation Rescue* rely on the Second Circuit's 1976 decision in *Kelner*, which CompassCare suggests is no longer good law. *See* Docket Item 36 at 19, 21 n.6. More specifically, CompassCare says that "Page fails to mention" that in *United States v. Turner*—which was decided more than a decade after *Operation Rescue*—the Second Circuit clarified that *Kelner*'s definition of a

"true threat" need not always be "unequivocal, unconditional, immediate, and specific."[13]

*See* Docket Item 36 at 19 (quoting *Kelner*, 534 F.2d at 1027 and citing *Turner*, 720 F.3d at 424).

---

[13] CompassCare also argues that Page "fail[ed] to mention the Supreme Court's controlling decision in *Counterman v. Colorado*, 600 U.S. 66, 69 (2023), in which the Court held that a 'true threat' arises when the 'defendant consciously disregard[s] a substantial risk that his communications w[ill] be viewed as threatening violence.'" Docket Item 36 at 17 (emphasis omitted) (quoting *Counterman*, 600 U.S. at 69).

In *Counterman*, the Supreme Court reaffirmed that "the First Amendment . . . requires proof that the defendant had some subjective understanding of the threatening nature of his statements" but that "a mental state of recklessness is sufficient." 600 U.S. at 69. The defendant in the case—Billy Counterman—"sent hundreds of Facebook messages to . . . a local singer," including messages such as "[s]taying in cyber life is going to kill you" and "You're not being good for human relations [sic]. Die." *Id.* at 70. Counterman was found guilty of violating a Colorado statue "making it unlawful to '[r]epeatedly . . . make[ ] any form of communication with another person' in 'a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress.'" *Id.* at 70 (alterations in original) (citation omitted). Counterman appealed on the grounds that his statements were "not true threats" because he had not intended the statements to be threatening and because the state had not proved the contrary; instead, Counterman noted, the trial court had required only that "a reasonable person" would have understood the statements to be threatening (i.e., a negligence standard). *See id.* at 71. The Supreme Court held that Colorado had indeed violated Counterman's rights because—while the state was not required to show that Counterman *intended* his statements to be threatening—it needed to show that he was at least reckless with respect to the statement's threatening nature: that is, that he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id.* at 69, 81-82.

Thus, *Counterman* concerned the mens rea requirements for holding someone criminally liable for threatening statements. But it is unclear what relevance it has to this case, which involves a specific-intent statute. *See* 18 U.S.C. § 248. In any event, and perhaps more importantly, there is no indication that the Court's conclusion in *Counterman* broadened the scope of the kind of content that might constitute a true threat: The Supreme Court was clear that a "true threat" is one that "taken in context" is a "serious expression[] conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (citation and internal quotation marks omitted); *see United States v. Garnes*, 102 F.4th 628, 637 (2d Cir. 2024) ("But the First Amendment protects even intemperate speech, and words that take a threatening form may simply reflect heated rhetoric that, in context, would not reasonably engender fear. Thus, to be consistent with the First Amendment, a threat crime requires an objective

In *Turner*, the defendant, Harold Turner, was convicted of "threatening to assault or murder" three Seventh Circuit judges after he "published a blog post declaring that [those] judges deserved to die for their recent decision that the Second Amendment did not apply to the states." 720 F.3d at 413-14. Among Turner's other statements, he wrote that "[i]f the[ judges] are allowed to get away with this by surviving, other [j]udges will act the same way" and that "[t]hese judges deserve to be made such an example of as to send a message to the entire judiciary: Obey the Constitution or die." *Id.* at 415. "The next morning[,] Turner posted photographs, work addresses, and room numbers for each of the three judges, along with a map indicating the location of the courthouse in which they worked, and a photograph of the building modified to point out 'Anti-truck bomb barriers.'" *Id.* at 414. On appeal, Turner argued, inter alia, that *Kelner* "define[d] threats very narrowly, and that [decision] require[d] reversal" in his case. *Id.* at 423.

The Second Circuit rejected Turner's argument. *See id.* at 423-24. It began by noting that *Kelner*'s statement that a true threat must be "unequivocal, unconditional, immediate[,] and specific" was dicta. *See id.* (quoting *Kelner*, 534 F.2d at 1027). And it found that requiring "*all* threats, whatever the statute prohibiting them, [to] satisfy these conditions before they may be punished consistent with the First Amendment" was incorrect and inconsistent with Second Circuit caselaw. *See id.* at 424. Indeed, the court noted that it had "affirmed convictions for threats that were both conditional and inexplicit," such as the statement that "I'll play likewise with you judges from a Koranic

element (the *actus reus*)—the threatening words must constitute a *true* threat."). As discussed here, Page's statements do not convey any such meaning.

and Torooh [sic] perspective thats [sic] an eye for an eye and life for a life." *See id.* (quoting *United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994)).

In light of that precedent, this Court agrees with CompassCare that to constitute a true threat, a statement need not threaten unequivocal, unconditional, immediate, and specific violence. But that does not mean that any statement that might be construed as a threat may be proscribed consistent with the First Amendment. Again, the crucial inquiry is "whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *Id.* at 420 (alteration in original) (quoting *Davila,* 461 F.3d at 305).

CompassCare urges that Page's statement that "Lying to women is a sin"—and even her theft of the sign—are true threats when viewed "in the context of violence against pro-life pregnancy centers and health care facilities by militant pro-abortion advocates over the past several years" and against the backdrop of Page's own past statements. *See* Docket Item 23 at ¶¶ 1, 56-58; Docket Item 36 at 7-8. Indeed, CompassCare says, "[b]y [her] deliberate acts of trespass, damage, theft[,] and vandalism," including her statement that "Lying to women is a sin," Page "intentionally threatened and intimidated, or attempted to threaten and intimidate, clients, potential clients, and staffers at" CompassCare's Amherst facility. *See* Docket Item 23 at ¶ 56. That is, it asserts,

> [b]ased on [her] radical pro-abortion extremist views, and [her] enmity toward pro-life crisis pregnancy centers, . . . Page . . . committed these violations as part of a wave of violence against pro-life pregnancy centers, to which Page . . . knowingly contributed by trespass and graffitied "warnings" on CompassCare's property that [she] knew would give rise to a reasonable fear of bodily harm in clients, potential clients, and staffers alike by sending the message that any pro-abortion extremist, at any time,

23

including [Page], could walk onto CompassCare's property to commit further acts of violence and destruction.

*Id.* at ¶ 58.

CompassCare's position here is chilling. It amounts to an assertion that if violence is connected in some way to a debated matter—even if the speaker has no direct connection to that violence—one cannot speak out without exposing oneself to liability. But that cannot be right, not if this country is to continue in its attempt to be a functioning democracy in a world of conflict, discord, and, unfortunately, violence. The violence of January 6 did not transfigure any statements on January 7 that Donald Trump had won the 2020 election into threats of violence, even if the speakers had connected with rioters on social media before the attacks. A racist statement by an avowed White Nationalist is not necessarily a threat—putting aside its specific content—simply because there is an epidemic of hate crimes in the United States. And—as the Second Circuit held in *Operation Rescue*—a statement that "killing babies is no different than killing doctors" is not stripped of First Amendment protection merely because it was made to a clinic doctor in Western New York "soon after the murder of Dr. [Barnett] Slepian," another doctor in Western New York. *Operation Rescue*, 273 F.3d at 196-97.

Indeed, as the Second Circuit explained in that decision, while it was "understandable that the clinic doctor feared for her safety" in the context of Dr. Slepian's tragic murder, "excessive reliance on the reaction of recipients would endanger First Amendment values, in large part by potentially misconstruing the ultimate source of the fear." *See id.* at 196. And because the protester's statement "went to the core of her protest message, and . . . (even in context) did not suggest that

[she] was engaged in a plan to harm the clinic doctor," it could not be penalized under the FACE Act. *Id.* at 196-97.

The same is true here. In fact, unlike the plaintiffs in *Operation Rescue*, CompassCare does not provide any specific facts showing that Page's writing "Lying to women is a sin" inspired fear in any particular person. *See* Docket Item 23. Moreover, the only fear that statement might inspire would be of consequences that might come in the afterlife. And there is simply no basis to interpret Page's statement as suggesting that she was "engaged in a plan to harm" anyone.[14] *See Operation Rescue*, 273 F.3d at 196-97.

"The hallmark of the protection of free speech is to allow 'free trade in ideas'— even ideas that" many or even "the overwhelming majority . . . might find distasteful or discomforting." *Black*, 538 U.S. at 358 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). And "as much as [courts] might idealize the antiseptic, rational exchange of views, expressions of anger, outrage[,] indignation"— and even condemnation—"nonetheless play an indispensable role in the dynamic public exchange safeguarded by the First Amendment." *See Operation Rescue*, 273 F.3d at 195.

Those principles apply with full force here. Put another way, the statement of the "pro-life" protester in *Operation Rescue* is like the statement by the "pro-abortion" Page

---

[14] CompassCare also argues that this Court should find that Page penned a threat because a bomb went "off only days after Page, who apparently knew the bombers, graffitied what could reasonably be construed as a warning in the spot where the bombing took place." Docket Item 36 at 21 n.6. But the fact that a bomb later exploded does not retroactively turn Page's statement—which did not refer to a bomb or indeed to any kind of violence—into a threat, nor does it suggest that it was perceived as a warning at the time.

in at least one way:  They are both neither "direct" nor "veiled threat[s]" but rather are "expression[s] of a political opinion."  *See id.* at 197.  And as such, they are both—and equally—"entitled to First Amendment protection."  *See id.*

Page's motion to dismiss CompassCare's first cause of action based on threats of force therefore is granted.

## 2.    Physical Obstruction

CompassCare also says that Page "physically obstruct[ed]" access to CompassCare in violation of the FACE Act, 18 U.S.C. § 248(a)(1).  Docket Item 23 at ¶¶ 61-66.  More specifically, it alleges that she

> trespassed on the property and wrote graffiti on the driveway of CompassCare's Amherst facility, while blocking the entrance to the facility's parking lot and intending to physically obstruct or attempting to physically obstruct, and in fact obstructing, staff, volunteers, and patients from entering the facility.

*Id.* at ¶ 62.  Page argues that this is not enough to plausibly allege that she "physically obstructed" access to CompassCare.  *See* Docket Item 30 at 21-22.  This Court disagrees.

The FACE Act defines "physical obstruction" as "rendering impassable ingress to or egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous."  18 U.S.C. § 248(e)(4).  To plead that a defendant violated the FACE Act, "[t]here must be an actual obstruction."  *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 480 (S.D.N.Y. 2006).  So "merely making the approach to health facilities 'unpleasant and even emotionally difficult does not automatically' constitute a violation of the [FACE] Act."  *Id.* (quoting *Operation Rescue*, 273 F.3d at 195).  At the same time, "physical

obstruction is [not] limited to 'bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult.'"  *Id.* (quoting *United States v. Mahoney,* 247 F.3d 279, 284 (D.C. Cir. 2001)).

In *Operation Rescue*, the Second Circuit suggested that allegations of protesters' "walk[ing in front of] oncoming cars[] and then deliberately attempt[ing] to slow or even stop the cars' progress"; "standing in front of . . . pedestrians [as they] tried to enter the building"; and "block[ing] clinic doors by standing directly in front of them and trying to communicate with those entering or leaving facility buildings" were enough—at least at the preliminary injunction stage—to state a claim that the protesters engaged in physical obstruction.  *See* 273 F.3d at 194.  Indeed, with respect to one protester in particular, the court found it sufficient to allege that she had "obstructed driveway access, using her body to slow moving cars and pushing literature and pamphlets through car windows," including by "dropping an item on the ground and then retrieving it in slow motion."  *See id.* at 195.  Along the same lines, a court in the Southern District of New York found that "standing near car doors so that patients cannot leave their cars . . . , standing directly in front of a patient and preventing her from approaching the clinic while they attempt to give her literature . . . , [and] standing directly in front of the Center door and refusing to move until a security guard approaches" were all "examples of physical obstruction."  *See Cain*, 418 F. Supp. 2d at 480.

Based on that caselaw, this Court concludes that CompassCare's allegation that Page "block[ed] the entrance to the facility's parking lot" and "obstruct[ed] staff, volunteers, and patients from entering the facility" is sufficient at the pleading stage to establish obstruction.  *See* Docket Item 23 at ¶ 62.  Likewise, the Court finds those facts

27

sufficient to plausibly allege that Page "intentionally . . . intimidate[d] or interfere[d] with" someone attempting to access CompassCare either to receive or to provide services. *See* 18 U.S.C. § 248 (a)(1).  Whether the evidence supports those allegations is a question for another day.

Therefore, the Court finds that CompassCare has plausibly alleged physical obstruction under section 248(a)(1).

### 3.    Whether Page Acted Because CompassCare Was Providing Reproductive Health Services

The inquiry does not end there, however.  As explained above, Page also argues that CompassCare has failed to allege that she "acted because the targeted person was or is obtaining or providing reproductive health services." *See* Docket Item 30 at 25-26. The FACE Act defines "reproductive health services" as "reproductive health services provided in a hospital, clinic, physician's office, or other facility" and states that the term "includes medical, surgical, counse[l]ing or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy."  18 U.S.C. § 248(e)(5).  Page says that CompassCare's "allegations do not give rise to a plausible inference that [she] engaged in any of the challenged conduct *because* anyone sought reproductive health services from CompassCare or *because* CompassCare provided such services."  Docket Item 30 at 25 (second emphasis added).  "Rather," Page posits, "the only plausible inference to be drawn from the [a]mended [c]omplaint is that Page acted because CompassCare was deceiving and interfering with pregnant people trying to obtain healthcare services (namely, abortions)."  *Id.* at 25-26.

The Court finds that Page's argument fails to draw all inferences in CompassCare's favor as is required on a motion to dismiss. *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). And when viewed in the light more favorable to CompassCare, the facts plausibly allege that Page acted because CompassCare "provid[es] reproductive health services." *See* 18 U.S.C. § 248 (a)(1).

First, as CompassCare observes, *see* Docket Item 36 at 22-23, the definition of "reproductive health services" is broad and includes "counsel[l]ing . . . relating to pregnancy or the termination of a pregnancy," *see* 18 U.S.C. § 248(e)(5). And viewing the facts in CompassCare's favor—rather than in the light that Page sees them—CompassCare has plausibly alleged that it provides reproductive services, including counseling concerning "pregnancy or the termination of a pregnancy." *See* Docket Item 36 at 23 (noting that amended complaint describes "ultrasounds, pregnancy tests, abortion pill reversal, pro-life pregnancy counseling, and referral for alternatives to abortion that CompassCare provides"); *see also United States v. Williams*, 701 F. Supp. 3d 257, 270 (S.D.N.Y. 2023) (noting that FACE Act "includes protection of access to . . . counseling about alternatives to abortion").

CompassCare also has plausibly alleged that Page acted because of the services CompassCare provides. Page concedes that the amended complaint describes her "pro-choice activism [and] social media activity" in support of that activism. *See* Docket Item 41 at 12. She contends, however, that "the only reasonable inference to be drawn is that [she] wrote 'lying to women is a sin' because CompassCare operates in a deceptive and misleading manner to *prevent* people from

obtaining reproductive health services." *Id.* But that is not "the only reasonable inference" that can be drawn; on the contrary, it is a strong inference in Page's favor. Drawing the inferences in CompassCare's favor, as this Court must on this motion, it is reasonable to infer that Page acted because she did not like CompassCare's providing counseling about alternatives to abortion.

Thus, the Court finds that CompassCare has plausibly alleged that Page acted because CompassCare provided "reproductive health services" under the FACE Act. And as a result, Page's motion to dismiss the second cause of action for physical obstruction under section 248(a)(1) is denied.

### C.    Section 248(a)(3) Claim

As noted above, CompassCare also alleges a claim against Page under 18 U.S.C. § 248(a)(3), which prohibits a person from "intentionally damag[ing] or destroy[ing] the property of a facility, or attempt[ing] to do so, because such facility provides reproductive health services." *See* Docket Item 23 at ¶¶ 72-78. CompassCare says that Page violated section 248(a)(3) when she vandalized its property by writing graffiti on its driveway and by stealing a "no[ ]trespassing" sign. *See id.* at ¶¶ 40-41, 72-73. Page argues that this claim fails for much the same reasons that the section 248(a)(1) claims fail: because (1) the amended complaint does not allege that she engaged in any proscribed conduct and (2) the amended complaint does not allege that she was motivated by CompassCare's provision of reproductive health services. Docket Item 30 at 27-28.

The FACE Act does not define what constitutes "damage[]" or "destr[uction]" under the statute. *See* 18 U.S.C. § 248. But courts have found that graffiti can violate

section 248(a)(3).  For example, a court in the Middle District of Florida denied a motion

to dismiss an indictment against four defendants for spray-painting threats on a

reproductive health facility building—in fact, a crisis pregnancy center; more specifically,

the court allowed charges under both section 248(a)(1) and 248(a)(3) to proceed.  *See*

*United States v. Freestone*, 2023 WL 5336790, at *1-2 (M.D. Fla. Aug. 18, 2023).  And

a court in the District of Arizona referred to the act of spray-painting words "on a facility"

as conduct that would violate section 248(a)(3).  *See Riely v. Reno*, 860 F. Supp. 693,

702 (D. Ariz. 1994).  So too here, this Court finds that CompassCare's allegation that

Page wrote graffiti on its driveway is sufficient to state a claim for damage or destruction

under the FACE Act.

It is true, as Page argues, that the amended complaint does not specify with what

material she wrote the graffiti and does not detail "what efforts were required to remove

the graffiti, or how the graffiti decreased CompassCare's property value or otherwise

injured it."  Docket Item 30 at 27-28.  But at this stage, the Court must draw all

inferences in CompassCare's favor.  *See Trs. of Upstate N.Y. Eng'rs Pension Fund*,

843 F.3d at 566.  And after doing that, this Court finds the allegations sufficient to allege

damage or destruction.

Of course, Page may well have arguments down the road that support summary

judgment on this claim.  For example, if it turns out that the graffiti was written in chalk,

then her citation to *United States v. Murtari*, 2007 WL 3046746 (N.D.N.Y. Oct. 16,

2007), may well be relevant.  *See* Docket Item 30 at 27 (citing *Murtari*, 2007 WL

3046746, at *3-5 (holding that defendant's attempt to deface a building with chalk did

not constitute an attempt to "damage" the surface in violation of a federal regulation)). But for now, there is enough for the claim to proceed.

Likewise, with respect to the stolen sign, Page argues that "[t]heft is not per se property damage." Docket Item 41 at 14 (emphasis omitted). In support of this contention, she cites a case "holding [that the] plaintiff failed to plead property damage when she alleged [that the] defendants broke into her house and removed 'valueless materials'" and another case holding that a "plaintiff must show more than 'de minimis' property damage to establish tort claim." *Id.* (emphasis omitted) (first citing *Savine-Rivas v. Farina*, 1992 WL 193668, at *3 (E.D.N.Y. Aug. 4, 1992), and then citing *Delmarva Power & Light v. Meter-Treater, Inc.*, 218 F. Supp. 2d 564, 571 (D. Del. 2002)). But again, Page's assuming that the sign had no value and that its removal caused no damage requires drawing inferences in her favor, which this Court cannot do on her motion to dismiss.

Finally, as explained above, *see supra* Section I.B.3, CompassCare has plausibly alleged that Page acted because CompassCare provided "reproductive health services," as defined by the FACE Act. Page's motion to dismiss CompassCare's fourth cause of action alleging property destruction or damage under the FACE Act therefore is denied.

## II.    COMPASSCARE'S MOTION TO DISMISS KAMKE'S COUNTERCLAIMS

As noted above, Kamke asserts counterclaims against CompassCare for: (1) medical malpractice; (2) negligence; and (3) negligent infliction of emotional distress. Docket Item 59 at 43-49. CompassCare has moved to dismiss all those claims for lack of subject matter jurisdiction and failure to state a claim. Docket Item 60. First, it

argues that this Court lacks subject matter jurisdiction over Kamke's counterclaims because they arise under state law and are not "so related to" CompassCare's federal law claims as to justify the exercise of supplemental jurisdiction. *See* Docket Item 61 at 8-15. Second, it says that Kamke's second amended counterclaims are barred by the First Amendment. *Id.* at 16-23. And third, it argues that even if this Court had supplemental jurisdiction and could constitutionally entertain the counterclaims, Kamke has failed to state a claim for malpractice, negligence, or negligent infliction of emotional distress. *See id.* at 24-30. The Court examines each argument below.

### A. Subject Matter Jurisdiction

District courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "For purposes of [section] 1367(a), claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'" *Krezic v. Advanced Endodontics of Buffalo, PC*, 2022 WL 1308448, at *1 (W.D.N.Y. May 2, 2022) (quoting *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011)); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

"In determining whether two disputes arise from a common nucleus of operative fact, [the Second Circuit has] traditionally asked whether the facts underlying the federal and state claims substantially overlapped or the federal claim necessarily brought the facts underlying the state claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (alterations, citation, and internal quotation marks omitted). "Courts consider and weigh in each case, and at every stage

of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise supplemental jurisdiction." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 117-18 (2d Cir. 2013) (citation and internal quotation marks omitted). "The exercise of supplemental jurisdiction is within the sound discretion of the district court." *Id.* at 117.

The Court finds—at least at this stage—that it may properly exercise supplemental jurisdiction over Kamke's counterclaims. There is indeed a substantial overlap between the facts underlying CompassCare's claims, on the one hand, and Kamke's counterclaims, on the other. CompassCare alleges that Kamke "is a pro-abortion extremist and activist who, on information and belief, posed as a potential client of CompassCare in a politically-motivated effort to 'expose' non-existent fraud and deception in CompassCare's pro bono services to expectant mothers." Docket Item 23 at ¶ 36. In contrast, Kamke alleges that "[s]he [wa]s just a woman who believed she might be pregnant [and therefore] sought accurate medical care and counseling at CompassCare"; she says that her later vandalism of CompassCare's property was motivated by her anger at how she was treated there. *See* Docket Item 59 at 41-42. That dispute is the very basis of both CompassCare's and Kamke's claims.[15]

CompassCare argues that there simply is no "common nucleus of operative fact" between its claims and Kamke's.[16] *See* Docket Item 61 at 8-15. More specifically, it

---

[15] Moreover, Kamke's motives for her conduct at the Amherst facility are relevant because to state a claim under the FACE Act, CompassCare must plead—and ultimately prove—that Kamke's acts were motivated by the fact that CompassCare provides reproductive health services. *See* 18 U.S.C. § 248(a)(1),(3).

[16] Citing *LaChapelle v. Torres*, 37 F. Supp. 3d 672 (S.D.N.Y. 2014) and *Bray v. City of N. Y.*, 356 F. Supp. 2d 277 (S.D.N.Y. 2004), CompassCare notes that Kamke went to an appointment at CompassCare almost a year and a half before she returned

says that Kamke's "alleged motive does not supply jurisdiction" because her "pleading negates itself." *Id.* at 13 (bold and underline omitted). And it asks the Court to conclude that the "only plausible motivation" for Kamke's actions are her political views about crisis pregnancy centers. *See id.* at 13-15.

But at this stage, the Court cannot decide that factual dispute. Kamke has alleged that she did not violate the FACE Act because what she did was not based on enmity for a reproductive health facility but rather was based on her specific past interactions with CompassCare—interactions that form the basis for her counterclaims. *See generally* Docket Item 59. Whether she can martial evidence to support those claims is a question for a later date. But this Court cannot and will not limit its subject matter jurisdiction by prejudging the merits of Kamke's claims.[17]

---

to vandalize it—a long "[t]emporal disconnect" between the events underlying the two sets of claims. *See* Docket Item 61 at 9-10 (bold and underline omitted). But the mere fact that there was a gap in time between these events does not eradicate the connection between the claims; *Bray* and *LaChappelle* involved federal and state claims where there was no such connection. *See LaChapelle*, 37 F. Supp. 3d at 682 ("There is no allegation that these loans, made before Torres was terminated, were related in any way to Torres's alleged trademark infringement after his termination."); *Bray*, 356 F. Supp. 2d at 283 (finding that court lacked supplemental jurisdiction over city's counterclaim that prior to mass bike ride at issue, plaintiffs had gathered without a proper special event permit, specifically noting that "[t]he [c]ity d[id] not aver that it seized [p]laintiffs' bicycles . . . to redress violations of the special event permit requirement"). But this case is quite the opposite: Kamke *does* allege that she committed the acts CompassCare complains of as a result of the prior events.

[17] This Court also rejects CompassCare's argument that Kamke's counterclaims should not be allowed to proceed because "her frivolous claims would [then] predominate over CompassCare's well[-]bottomed FACE [Act] claims, causing a massive impairment of judicial economy." Docket Item 61 at 12. For one thing, as just noted, this Court cannot assess the substantive merits of the respective claims at this time; for another, it is not clear to this Court that exercising supplemental jurisdiction here would cause "massive impairment of judicial economy." Indeed, even if the state law claims did not proceed here, Kamke presumably would be entitled to discovery

## B.    First Amendment Bar

Next, CompassCare argues that Kamke's counterclaims are barred because they are "replete with, and wholly dependent upon, inadmissible attacks on CompassCare's protected speech."  Docket Item 61 at 16 (bold omitted).  This argument appears to be rooted in *Snyder v. Phelps*, 562 U.S. 443 (2011), and *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988).  In those cases, the Supreme Court held that "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits."  *Snyder*, 562 U.S. at 451 (citing *Hustler Mag.*, 485 U.S. at 50-51); *see* Docket Item 61 at 16, 22 (citing those cases).

In *Snyder*, the Court found that the First Amendment barred a tort suit filed by the father of a soldier whose funeral was picketed by the members of the Westboro Baptist Church.  562 U.S. at 460-61.  Because the Supreme Court determined that the church members spoke on matters "of public concern"—that is, topics "fairly considered [to be] relat[ed] to any matter of political, social, or other concern to the community" or "a subject of general interest and of value and concern to the public"—it held that the speech was constitutionally protected.  *Id.* at 451-58.

CompassCare's speech on abortion—and on any public concern for that matter—is indisputably protected under the First Amendment, and this Court agrees that if Kamke had brought a tort suit based on CompassCare's speech, her claims would be barred.  But that is not the case here.  As Kamke notes in her reply, her claims "are not premised" on CompassCare's "broader position in opposition to abortion care"

_____

related to her previous encounters with CompassCare as relevant to the intent element of CompassCare's FACE Act claim.

or on its "speech or beliefs"; instead, her claims are "premised . . . solely on [CompassCare's] conduct in [allegedly] providing substandard medical care." *See* Docket Item 52 at 3 n.2. This Court agrees. As such, the First Amendment does not bar Kamke's second amended counterclaims.

### C.    Failure to State a Claim

CompassCare also argues that Kamke has failed to satisfy the pleading standard under *Iqbal* and *Twombly*; in particular, it says, her counterclaims do not "contain sufficient factual matter, accepted as true, [that] state[s] a claim to relief that is *plausible* on its face." Docket Item 61 at 24 (quoting *Iqbal*, 556 U.S. at 678).

Several of CompassCare's arguments in this vein, however, ask this Court to decide factual questions at the pleading stage or not to draw reasonable inferences in Kamke's favor. *See, e.g.*, *id.* at 25 (arguing that Kamke fails to state a claim for medical malpractice because there are "no known risks of having [a] transvaginal ultrasound" (citation and emphasis omitted)); *id.* at 7, 29 (arguing that Kamke's claim to have "'agonized' over whether she was pregnant" is "preposterous" based on her failure to take certain steps as well as "her own inevitable menstrual cycle" (bold omitted)). But at this stage, what CompassCare asks is beyond what this Court can do. *See Naor World Media Films, Inc. v. JC Prod.*, 2024 WL 1177977, at *1 (S.D.N.Y. Mar. 19, 2024) (noting that on motion to dismiss counterclaims, counterclaimant's allegations must be accepted as true and all reasonable inferences drawn in her favor). The Court therefore considers only those arguments suggesting that Kamke's allegations—accepted as true—do not state a claim on which relief can be granted.

### 1.    Medical Malpractice and Negligence

"To show negligence under New York state law, a plaintiff must demonstrate '(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result.'" *Ferreira v. City of Binghamton*, 975 F.3d 255, 266 (2d Cir. 2020) (quoting *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)).  But "[w]hen the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence."  *La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 101 (2d Cir. 2014).  To prove medical malpractice, a plaintiff must establish: "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage."  *Schoolcraft v. City of N.Y.*, 103 F. Supp. 3d 465, 534 (S.D.N.Y. 2015).

"Under New York law, 'there is no prohibition against simultaneously pleading both an ordinary negligence cause of action and one sounding in medical malpractice.'" *Jones v. Beth Israel Hosp.*, 2018 WL 1779344, at *9 (S.D.N.Y. Apr. 12, 2018) (quoting *Ingutti v. Rochester Gen. Hosp.*, 145 A.D.3d 1423, 1424, 44 N.Y.S.3d 274, 275-76 (4th Dep't 2016)); *see Ingutti*, 145 A.D.3d at 1424, 44 N.Y.S.3d at 276 ("It is simply beyond cavil 'that an action for personal injuries may be maintained, in the proper case, on the dual theories of medical malpractice or simple negligence where a person is under the care and control of a medical practitioner or a medical facility.'" (quoting *Twitchell v. MacKay,* 78 A.D.2d 125, 127, 434 N.Y.S.2d 516, 518 (4th Dep't 1980))).  "In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to

have breached." *Jones*, 2018 WL 1779344, at *9. "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." *Id.*; *see also Sweeney v. Presbyterian/Columbia Presbyterian Med. Ctr.*, 763 F. Supp. 50, 52 (S.D.N.Y. 1991) (explaining that "conduct which constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician is medical malpractice" as opposed to general negligence (citation and internal quotation marks omitted)).

Here, Kamke alleges that CompassCare deviated from accepted medical practice by (1) "fail[ing] . . . to obtain [her] informed consent before performing an invasive transvaginal ultrasound"; (2) "misdiagnosing [her] as pregnant after belatedly reading her pregnancy test"; and (3) "failing to maintain correct and complete records of [her] visit." *See* Docket Item 66 at 19. Alternatively, she argues that "CompassCare was negligent in purporting to treat her as a patient." *See id.* at 27. And she alleges that CompassCare's actions caused her emotional harm. *See id.* at 28-29.

The Court finds that Kamke has plausibly alleged medical malpractice and negligence claims. Taking her allegations as true, as the Court must at this stage, she has alleged that CompassCare either departed from accepted practice or—if CompassCare's actions did not "constitute[] medical treatment or bear[] a substantial relationship to the rendition of medical treatment," *see Sweeney*, 763 F. Supp. at 52—breached CompassCare's general duty of care. Moreover, Kamke has alleged that

CompassCare's actions proximately caused her damage: emotional distress.[18]
Whether Kamke's claims ultimately have merit—under either a theory of medical
malpractice or of ordinary negligence—is a question for down the road.

### 2.    Negligent Infliction of Emotional Distress

"To plead a negligent infliction of emotional distress claim under New York law, a
plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a
direct causal connection between the breach and the emotional harm; and (4)
circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings
Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021); *see Ornstein v. N.Y.C. Health &
Hosps. Corp.*, 10 N.Y.3d 1, 6, 881 N.E.2d 1187, 1189 (2008) (discussing this standard).
"To establish the fourth element, the plaintiff generally must plead that the breach
endangered his physical safety or caused him to fear for his physical safety." *Francis*,
992 F.3d at 81 n.57 (citing *Taggart v. Costabile*, 131 A.D.3d 243, 253, 14 N.Y.S.3d 388,
396 (2d Dep't 2015)).  But "New York also recognizes a cause of action in cases where
there is 'an especial likelihood of genuine and serious mental distress, arising from . . .
special circumstances, which serves as a guarantee that the claim is not spurious.'"
*Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. State*, 37
N.Y.2d 378, 382, 334 N.E.2d 590, 592 (1975)).  For example, in *Johnson*, the New York

---

[18] There is no bar on medical malpractice claims alleging only an emotional
injury. *See, e.g.*, *Harvey v. Cramer*, 235 A.D.2d 315, 316, 653 N.Y.S.2d 3, 4 (1st Dep't
1997) (finding that "[i]t was error to dismiss the medical malpractice cause of action on
the ground that plaintiff's claim that defendant's . . . doctor[] mistakenly informed him
that he was HIV positive because of a mix[-]up in patient files sounds in ordinary
negligence" and that "[t]he distress resulting from a negligent misdiagnosis of HIV is
actionable").

State Court of Appeals upheld a woman's claim that a hospital had negligently misinformed her that her mother had died.  *See* 37 N.Y.2d at 382-83, 334 N.E.2d at 593.  And in *Baker*, the Second Circuit allowed a claim "for negligent infliction of emotional distress in the case of a negligent positive result on an HIV test" to go forward.  *See Baker*, 239 F.3d at 422.

Here, however, the Court need not decide whether Kamke's allegations fall into the narrow set of special circumstances for a negligent infliction of emotional distress claim without endangerment or fear for physical safety.  Rather, Kamke's "claim for negligent infliction of emotional distress must be dismissed because it is duplicative of [her] claim for negligence," as "both claims rest on the same facts and seek the same damages."  *See Watkins v. Harlem Ctr. for Nursing & Rehab., LLC*, 2021 WL 4443968, at *13-14 (S.D.N.Y. Sept. 28, 2021) (allowing negligence claim to proceed for mishandling of the plaintiff's deceased family member's remains but granting motion to dismiss negligent infliction of emotional distress claim as duplicative); *see also D.J. by Comfort v. Corning-Painted Post Area Sch. Dist.*, 722 F. Supp. 3d 148, 168 (W.D.N.Y. 2024) (collecting cases dismissing negligent infliction of emotional distress claim as duplicative of negligence claim).

This Court therefore dismisses Kamke's claim for negligent infliction of emotional distress as duplicative.

## CONCLUSION

For the reasons stated above, Page's motion to dismiss CompassCare's amended complaint is GRANTED in part and DENIED in part.  More specifically, the Court GRANTS the motion as to CompassCare's first cause of action for threatening

force in violation of 18 U.S.C. § 248(a)(1) but otherwise DENIES the motion and allows CompassCare's claims to proceed.  CompassCare's motion to dismiss Kamke's second amended counterclaims also is GRANTED IN PART and DENIED IN PART:  It is GRANTED as to Kamke's negligent infliction of emotional distress claim but DENIED as to her medical malpractice and negligence claims.  CompassCare shall answer the second amended counterclaims that this Court has allowed to proceed within 21 days of the date of this decision and order.

       SO ORDERED.

       Dated:   September 30, 2025
                  Buffalo, New York

                                */s/ Lawrence J. Vilardo*
                                LAWRENCE J. VILARDO
                                UNITED STATES DISTRICT JUDGE